

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00758-CV

**IN THE INTEREST OF K.A.D.K. and J.B.L.E.**, Children

From the 218th Judicial District Court, Wilson County, Texas
Trial Court No. 14-10-0616-CVW
Honorable Melissa Uram-Degerolami, Judge Presiding

Opinion by:   Jason Pulliam, Justice

Sitting:       Rebeca C. Martinez, Justice
               Patricia O. Alvarez, Justice
               Jason Pulliam, Justice

Delivered and Filed:  April 20, 2016

AFFIRMED

This is an appeal from an order terminating appellant-Mother's parental rights to her two children, K.A.D.K. and J.B.L.E.[1]   Mother contends (1) the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interests of the children and (2) trial counsel rendered ineffective assistance of counsel.  We affirm the judgment of the trial court.

---

[1] To protect the identity of the minor children, we refer to the children's parents as Mother and to the children by their initials.  *See* TEX. FAM. CODE ANN. § 109.002 (West 2014); TEX. R. APP. P. 9.8(b)(2).  Although the trial court also terminated the parental rights of K.A.D.K.'s presumed father and J.B.L.E.'s alleged father, Mother is the only parent to appeal the trial court's judgment.  Therefore, this court will only discuss the trial court's judgment as it pertains to Mother.

**BACKGROUND**

On September 3, 2014, the Department of Family and Protective Services ("the Department") received a referral alleging neglectful supervision against Mother for leaving her children K.A.D.K., age 4, and J.B.L.E., age 2, alone in her apartment regularly. The referral also alleged Mother abused prescription drugs.

Upon validating the referral, the Department developed a safety plan with Mother, under which Mother was to have only supervised contact with the children. Beginning September 22, 2014, the children resided with a family friend, M.N., who agreed to supervise contact between Mother and the children and allowed Mother to live in her home as well. Two days later, however, M.N. contacted the caseworker, stating she could not care for the children due to Mother's abusive behavior. When the caseworker followed up on the complaint, Mother admitted she and M.N. argued.

The Department then placed the children with family friends, M.F. and L.F., who the children already referred to as grandmother and grandfather. M.F. and L.F. agreed to care for the children and to supervise all contact between Mother and the children. M.F. and L.F. additionally indicated they would be willing to adopt the children if Mother and children could not be successfully reunified.

On October 8, 2014, the Department filed a petition to terminate Mother's parental rights. Following an adversary hearing held on October 15, 2014, the trial court signed a temporary order assigning the Department as temporary managing conservator of the children and assigning Mother as temporary possessory conservator with limited access. The children remained in foster care with M.F. and L.F.

On April 13, 2015, the children were moved into emergency placement when M.F. and L.F. relinquished care of the children to the Department because Mother's behavior had become

untenable and caused too much stress to the lives of L.F., M.F., and their family. At the same time, Mother alleged M.F. abused K.A.D.K. The Department then placed the children with C.W., another friend of Mother's. On October 15, 2015, the Department placed the children in a new foster home because C.W. began experiencing health problems and could no longer care for the children.

The trial court held the required status and permanency hearing, and the parties tried the case to the bench on November 9, 2015. Mother was present at trial and represented by court-appointed counsel. The trial court heard testimony from Mother and five other witnesses: Department supervisor Kim Ricktor; Department caseworker Myra Escobedo; counselor Cesar Garza; counselor Mary Ann Sieracki; and psychologist Dr. Jacob Pickard. After receipt of evidence and testimony, the trial court found Mother engaged in one or more of the acts or omissions necessary to support termination of her parental rights pursuant to Texas Family Code Sections 161.001(1)(D), (E), and (O). The trial court also found termination of Mother's parental rights was in the best interests of the children, pursuant to Texas Family Code Section 161.002(2). Based on those findings, the trial court ordered that the parent-child relationship between Mother and her children K.A.D.K. and J.B.L.E. be terminated. Mother perfected this appeal.

**ANALYSIS**

On appeal, Mother contends the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest. Mother also argues trial counsel rendered ineffective assistance of counsel.

**Best Interests of the Children**

*Standard of Review*

To terminate parental rights pursuant to section 161.001 of the Family Code, the Department has the burden to prove: (1) one of the predicate grounds in subsection 161.001(1);

and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2015); *In the Interest of A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Both elements must be established, and termination may not be based solely on the best interest of the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Because a parent's right to the companionship, care, custody, and management of children is a constitutional interest "far more precious than any property right, a judgment terminating parental rights must be supported by clear and convincing evidence." TEX. FAM. CODE ANN. § 161.206(a) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also In the Interest of J.F.C.*, 96 S.W.3d 256, 273 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *J.F.C.*, 96 S.W.3d at 263.

Consequently, termination proceedings must be strictly scrutinized, and "involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. To determine if the heightened burden of proof was met, an appellate court must employ a heightened standard of review—judging whether a "factfinder could reasonably form a firm belief or conviction about the truth of the [Department's] allegations." *In the Interest of C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role. *Id.* at 26. An appellate court must not reweigh issues of witness credibility but must defer to the factfinder's determinations so long as those determinations are reasonable. *In the Interest of J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

*Sufficiency of the Evidence Review*

Under the strict scrutiny implicit in termination cases and the necessity of clear and convincing evidence, the traditional legal and factual standards of review are inadequate. *J.F.C.*, 96 S.W.3d at 264-66. Instead, in conducting a legal sufficiency review of termination of parental rights, an appellate court must view all of the evidence in the light most favorable to the finding and determine whether a reasonable factfinder could have formed a firm belief or conviction that its ultimate findings are true. *See id.* at 266. In viewing the evidence in the light most favorable to the judgment, the appellate court "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* However, the appellate court may not simply disregard undisputed facts that do not support the finding; to do so would not comport with the Department's heightened burden of proof by clear and convincing evidence. *Id.* If, after conducting its legal-sufficiency review of all the evidence, a court determines no reasonable factfinder could form a firm belief or conviction consistent with the final judgment, then the court must conclude the evidence is legally insufficient. *Id*.

When reviewing a factual sufficiency challenge, the analysis is somewhat different in that the appellate court must consider all of the evidence equally, both disputed and undisputed. *In the Interest of A.S.*, 261 S.W.3d 76, 82 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *J.F.C.*, 96 S.W.3d at 266. The appellate court must determine whether the disputed evidence is such that a reasonable fact finder could have formed a firm conviction or belief about the truth of the Department's allegations. *A.S.*, 261 S.W.3d at 82; *J.F.C.*, 96 S.W.3d at 266. In doing so, the appellate court must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so and disregard all evidence that a reasonable factfinder could have disbelieved. *J.F.C.*, 96 S.W.3d at 266. Finally, in its analysis of this evidence the appellate court

should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* The appellate court must hold the evidence to be factually insufficient if, in light of the entire record, the disputed evidence contrary to the judgment is so significant that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.*; *A.S.*, 261 S.W.3d at 82.

*Best Interest Findings*

When considering the best interest of the child, the court recognizes the existence of a strong presumption that a child's best interest is served by preserving the parent-child relationship. *In the Interest of R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, the court also presumes that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2015). In determining the best interest of the child, the court may consider the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive. *In the Interest of C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

"The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In analyzing these factors, the court must focus on the best interest of

the child, not the best interest of the parent. *Dupree v. Tex. Dept. of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). A factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In the Interest of B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2004, pet. denied).

*Application*

Turning to the evidence regarding the best interest of the children, we consider the *Holley* factors as outlined above.

### *Desires of the Children*

The record is silent regarding whether K.A.D.K. verbally expressed his desires. However, his behavior when first placed with C.W. was not exemplary. K.A.D.K. was aggressive toward his younger sister and "acted out" by pushing and yelling. K.A.D.K. received counseling, and his foster parents focused attention on helping him improve his behavior. Recently, his disciplinary chart from school showed his behavior as regularly "green" or good. However, on days following visits with Mother, his behavior was recorded as "yellow" or "orange" for bad.

At the time of trial, the children were five and three years' old, respectively. J.B.L.E. was not able to verbally communicate her desires because of her age. However, when a child is too young to express its desires, the factfinder may consider whether the child has bonded with its current caregiver, is well-cared for, and whether the child has spent minimal time with the parent. *In the Interest of J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The record shows the children had not been in Mother's custody since September 2014. According to Department caseworker Escobedo, the children were happy to see Mother when she visited, but pointed out Mother missed several visits while the children were placed with C.W. Escobedo testified the children were currently placed together in a foster-to-adopt home that would lead to permanent placement. Escobedo also testified the children were well-cared for and an

obvious bond existed between the children and the foster family.  Escobedo additionally testified the children identified their foster parents as "mom" and "dad."

With regard to the first factor, the children's desires, the evidence weighs in favor of the trial court's finding.

*Emotional and Physical Needs*

A child's need for permanence is a paramount consideration for the child's present and future physical and emotional needs.  *See Dupree*, 907 S.W.2d at 87.  The goal of establishing a stable permanent home for a child is a compelling government interest.  *In the Interest of M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.—San Antonio 2002, no pet.).  A factfinder may infer from a parent's past inability or unwillingness to meet a child's physical and emotion needs an inability or unwillingness to meet a child's needs in the future.  *J.D.*, 436 S.W.3d at 118.

Due to the children's ages, K.A.D.K. was the only child able to undergo a mental health assessment following removal from Mother's custody.  J.B.L.E. was too young for formal evaluation.  The record shows K.A.D.K. was diagnosed with disruptive behavior disorder and depressive disorder with anxious features.  The treatment recommendation for K.A.D.K. was both individual counseling and family therapy to provide support with coping skills and improve his communication skills.

Mother testified she was "more than ready" to take the children home and provide the support both children needed.  Dr. Pickard, however, testified he diagnosed Mother with maladaptive personality features, which affected Mother's emotional functioning in relationships. According to Dr. Pickard, Mother lacked empathy and understanding of others' needs and blamed others rather than accepting responsibility for her own behavior.  Dr. Pickard testified Mother's personality disorder was a concern and a high risk factor with regard to Mother's ability to care for and parent her children.

Escobedo testified the children's current placement provided for the children's physical needs of a drug free home, transportation for counselling sessions and medical appointments, food, and a nurturing home. According to Escobedo, J.B.L.E. was comfortable in her surroundings and friendly with everyone. Escobedo also testified the foster parents made certain K.A.D.K. attended his weekly counseling sessions and were attempting to arrange in-home counseling as well.

The evidence with respect to this factor weighs in favor of the trial court's finding that if the children returned to Mother's custody, they would face an uncertain and unstable life, thus jeopardizing their physical and emotional well-being.

*Emotional and Physical Danger to the Children*

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In the Interest of R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A trial court may examine the parent's history with other children when considering the risks or threats of a parent's environment. *In the Interest of E.A.F.*, 424 S.W.3d 742, 751 (Tex. App.—Houston [14th Dist.] 2014, pet. denied.).

At the time of the trial, Mother was thirty-three years' old and reported having used illegal drugs from the age of twelve and reported experimenting with cocaine and methamphetamine when she was fourteen years' old. Mother also began drinking as a child. Mother also reported using opioids. However, Dr. Pickard testified Mother asserted to him she did not have a substance abuse problem and minimized her drug use.

Mother's history with the Department began in 2007, when she gave birth to her oldest child, who tested positive for cocaine. At that time, Mother admitted to using cocaine, marijuana, and amphetamines, and she tested positive for all three illegal substances. Mother was referred to an inpatient drug treatment program, but she relapsed, and left the treatment facility. Ultimately, Mother's parental rights to her oldest child were terminated, and the child was adopted.

In 2011, when K.A.D.K. was one year old, Mother used methamphetamines and engaged in domestic violence with K.A.D.K.'s father. The Department referred Mother to Family Based Services. Mother completed her service plan and attended AA/NA sessions.

The instant case began in 2014, when Mother was referred to the Department for leaving her children unattended in their home and abusing prescription drugs. Mother admitted she used methamphetamine when she was caring for K.A.D.K. and J.B.L.E. Mother also left the children, then four and two years' old, locked in her home without supervision.

During the pendency of this case, Mother underwent random drug testing. Mother submitted to only four of the eleven possible drug tests. Escobedo testified Mother offered several excuses for not appearing for drug testing, including lack of transportation and needing to run errands. Escobedo additionally reported several occasions on which Escobedo went to Mother's home to perform a drug test, but no one answered the door despite obvious signs someone was in residence. Mother's results for the four drug tests to which she submitted were negative. Escobedo also testified that Mother had a prescription for Xanax, which should have appeared on the most recent drug test — a hair follicle test — but did not.

During her testimony, Escobedo also expressed concern for Mother's continued involvement in unhealthy relationships. The record shows Mother was involved in a series of abusive relationships in which the violence between Mother and her partner was reciprocal. On at least one occasion, K.A.D.K. was present during the violence. A background check conducted on Mother's current boyfriend revealed a history of serious offenses, including bodily injury to a family member. Escobedo testified Mother was informed it was not appropriate for the children to be around the current boyfriend, but as of two weeks prior to trial, Mother was still engaged in this relationship. Mother insisted the man was not her boyfriend, but did not deny she had a

relationship with him. During her testimony, Mother agreed being exposed to substance abuse and violence was not good for the children.

Dr. Pickard testified Mother's pattern of drug abuse and domestic violence poses a risk to the children. According to Dr. Pickard, being exposed to substance abuse and continued domestic violence negatively affects children's emotional stability.

The evidence regarding Mother's past and recent conduct and drug use weighs in favor of the trial court's finding that the children's physical and emotional well-being would be in danger were they to return to Mother's custody.

*Parental Abilities/Programs Available to Assist*

A parent's inability to provide adequate care for a child, lack of parenting skills, and poor judgment may be considered when examining children's best interests. *In the Interest of C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.); *see In the Interest of D.P.R.V.*, No. 04-09-00644-CV, 2010 WL 2102989, at *1 (Tex. App.—San Antonio 2010, no pet.).

Dr. Pickard testified he evaluated Mother as part of her service plan and recommended inpatient treatment, consistent AA/NA meetings, and that Mother obtain a sponsor. Dr. Pickard also recommended Mother attend domestic violence and anger management classes and undergo psychiatric evaluation. However, Escobedo testified Mother failed to complete both the domestic violence or anger management classes.

Garza, Mother's first counselor, testified he provided in-home counseling beginning in April 2015 because Mother did not have transportation. While Mother underwent counseling with Garza, he recommended Mother see a psychiatrist and attend AA/NA meetings. According to Garza, Mother told him she saw a psychiatrist, but never provided him with a copy of a prescription or any of the psychiatrist's recommendations. Likewise, Mother did not provide Garza with proof she attended AA/NA meetings, although she insisted she attended. Garza testified Mother did not

meet the goals of sobriety and, although he discussed anger management with her, there was never "therapeutic intervention" in that area.

Garza further testified Mother consistently attended counseling for approximately two months, but then began cancelling appointments and not returning phone calls or text messages. According to Garza, during that that time, Mother took part in only six of fifteen counseling sessions. Garza testified he discharged Mother from therapy because Mother cancelled so many times. Mother testified she cancelled sessions because she had a bed bug problem in her home.

Following her September 8, 2015, trial setting, Mother again underwent individual counseling with Sieracki. According to Sieracki, Mother attended five counseling sessions prior to the trial on the merits, but was not focused during the counseling sessions and did not actively participate in counseling. Sieracki testified Mother did not provide proof of attending NA meetings or obtaining a sponsor when asked. Sieracki also testified Mother minimized her anger issues and failed to address therapeutic issues such as substance abuse, anger management, and anxiety.

Escobedo testified that following removal, Mother completed a parenting class and provided the certificate to Escobedo. Mother testified she attended AA/NA meetings, but could not provide proof she had done so prior to five weeks before trial. Additionally, during her trial testimony, Mother was unable to identify the first step of the twelve-step program, although she testified she was currently "working" on that step with her sponsor.

With regard to the fourth and fifth factors, the evidence weighs in favor of the trial court's finding.

### *Plans for the Children/Stability of the Home*

With regard to the final factors, the evidence is neutral. Mother testified she was "more than ready" to take the children home with her. Mother testified she had been living in the same

home for six years and asserted the Department had expressed no concerns regarding the living conditions. According to Mother, there were two air mattresses and a toddler bed. Mother testified she had not had stable employment since 2012, but she currently earned $75 a week for helping a friend's mother around the house. Mother did not have any other current employment, but had applied several places. Mother admitted she did not have a drivers' license, but asserted she had a small support group that assisted her with such things as driving her to appointments.

Sieracki testified Mother did not have any real plans in place for supporting the children, and Escobedo testified Mother had not shared any specific plans regarding how Mother would care and provide for the children. According to Escobedo, Mother applied for housing assistance every three months and received assistance with her utility bills from a local church. Escobedo expressed concern with this situation because of the impermanent nature of the assistance. Escobedo additionally testified she viewed only a sofa and one bed when she visited Mother's home.

### *Conclusion*

After determination and weight of the *Holley* factors and viewing the evidence in the light most favorable to the finding, this court concludes the trial court could reasonably have formed a firm conviction that termination of Mother's parental rights is in the children's best interest. Thus, the evidence is legally sufficient to support this finding. Based upon the same evidence and conclusions, the evidence is also factually sufficient to support the trial court's finding that termination was in the children's best interest.

Mother's first issue is overruled.

### Ineffective Assistance of Counsel

In her second issue, Mother contends her trial counsel rendered ineffective assistance of counsel because counsel failed to (1) communicate with Mother; and (2) advise Mother of her right to a jury trial.

### *Standard of Review*

The statutory right to counsel in parental-rights terminations cases includes a guarantee that counsel will perform effectively. *In the Interest of M.S.*, 115 S.W.3d 534, 544 (Tex. 2003); *see* TEX. FAM. CODE ANN. § 107.013(a)(1) (West Supp. 2015). In analyzing the effectiveness of counsel in a parental-rights termination case, Texas courts follow the standard established in *Strickland v. Washington*. *M.S.*, 115 S.W.3d at 544-45 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Under the *Strickland* standard, the appellant has the burden to show (1) counsel's performance was deficient; and (2) the deficiency prejudiced the appellant's defense. *Strickland*, 466 U.S. at 687; *M.S.*, 115 S.W.3d at 545. An appellant's failure to satisfy either prong of the *Strickland* test will defeat a claim of ineffective assistance. *Strickland*, 466 U.S. at 700; *In the Interest of K.A.S.*, 399 S.W.3d 259, 264 (Tex. App.—San Antonio 2012, no pet.).

Under *Strickland*'s first prong, an appellant must show trial counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88. Only when counsel's "conduct was so outrageous that no competent attorney would have engaged in it" will the challenged conduct constitute deficient performance. *M.S.*, 115 S.W.3d at 545 (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). An appellate court's scrutiny of trial counsel's performance is highly deferential and must avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. For that reason, a reviewing court indulges in a strong presumption that trial counsel's conduct falls within the wide range of reasonable, professional assistance and was motivated by sound trial strategy. *Id*.; *M.S.*, 115 S.W.3d at 545. An appellant bears the burden to overcome the presumption that the challenged conduct might be considered sound trial strategy. *Strickland*, 466 U.S. at 689.

Under the second prong of *Strickland*, an appellant must show there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.

*M.S.*, 115 S.W.3d at 550. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

Additionally, the "record" requirement established in *Strickland* also applies to parental-rights termination cases. *See In the Interest of K.K.*, 180 S.W.3d 681, 685 (Tex. App.—Waco 2005, no pet.). Under this standard, allegations of ineffectiveness of counsel in a parental-rights termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Walker v. Tex. Dep't of Family and Protective Servs.*, 312 S.W.3d 608, 622-23 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). When the record is silent as to the reasons for counsel's conduct, the reviewing court may not speculate to find representation ineffective. *Id*. at 623.

### *Application*

With regard to the first *Strickland* prong, the record before this court is silent as to trial counsel's strategy regarding the challenged conduct. Mother did not file a motion for new trial from which she could have elicited testimony from trial counsel, nor did she provide an affidavit in which trial counsel could explain the challenged conduct. Because the record is silent as to the reasons for trial counsel's conduct, this court may not speculate as to the reasons behind counsel's actions or omissions to find counsel's performance deficient. *See Walker*, 312 S.W.3d at 623. This court has thoroughly reviewed the record and concludes Mother failed to overcome the presumption that trial counsel's representation fell within the wide range of reasonable, professional assistance and might be considered sound trial strategy. *See M.S.*, 115 S.W.3d at 545. Nothing in the record indicates trial counsel failed to communicate with or advise Mother. *See Walker*, 312 S.W.3d at 622-23. For these reasons, Mother failed to satisfy the first prong of *Strickland*.

Texas courts have recognized the inequities created by the "record" requirement in parental-rights termination cases. *See K.K.*, 180 S.W.3d at 685 n.3. Unlike criminal cases, parental-rights termination cases have no habeas remedy in which to develop the necessary record. *See id.* at 686. In many cases, based upon the procedural posture, parents may not have a meaningful opportunity to develop a post-trial record to support an ineffective assistance of counsel claim. *See e.g. M.E.-M.N.*, 342 S.W.3d at 258; *K.K.*, 180 S.W.3d at 688. Abatement and remand to the trial court is a procedure available to indigent parents to develop a record on an ineffective assistance of counsel claim. *K.K.*, 180 S.W.3d at 688. However, whether abatement is appropriate depends on the facts of each parental-rights termination case and the specific allegations of ineffective assistance. *Id.*

Abatement is unnecessary in this case because Mother would be unable to show the challenged deficiencies prejudiced her defense. Even assuming trial counsel's performance was deficient based on the cited failures to communicate and advise Mother of her right to a jury trial, Mother cannot show a reasonable probability that but for trial counsel's deficiencies the outcome of the proceeding would have been different.

The evidence presented at trial supports the trial court's finding that termination of Mother's parental rights is in the children's best interests. *See Holley*, 544 S.W.3d at 372 (listing the factors relevant to whether termination is in the best interests of the children). The evidence of Mother's dug use supports a finding that termination of parental rights is in the children's best interests. *See In the Interest of M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.). The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.). Additionally, Mother failed to comply with the Department's service plan. *See M.R.*, 243 S.W.3d at 821 (failure to comply with service plan supports termination finding). Further, the evidence establishing K.A.D.K. and J.B.L.E. were

exposed to both substance abuse and domestic violence supports the finding that termination of Mother's parental rights is in the children's best interests. *See In the Interest of J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

Mother does not dispute this evidence or contend it was admitted as a result of trial counsel's deficient performance. Because the record contains sufficient unchallenged evidence to support the trial court's termination of Mother's parental rights, Mother cannot establish any alleged deficient performance on trial counsel's part prejudiced her defense. Accordingly, Mother has not satisfied her burden of demonstrating ineffective assistance of counsel.

Mother's second issue is overruled.

## CONCLUSION

Based on the foregoing reasons, we overrule Mother's issues on appeal in which she challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of the children and contends she received ineffective assistance of counsel. We affirm the trial court's judgment as to Mother. No costs shall be assessed against Mother in relation to this appeal because she qualifies as indigent.

Jason Pulliam, Justice